# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| SIERRA CLUB,<br><br>    *Petitioner*,<br><br>  v.<br><br>U.S. ENVIRONMENTAL PROTECTION AGENCY and LEE M. ZELDIN, in his official capacity as Administrator of the United States Environmental Protection Agency,<br><br>    *Respondents*. | Case No. 25-1081 |

## PETITION FOR REVIEW

Pursuant to Clean Air Act § 307(b)(1), 42 U.S.C. § 7607(b)(1), Rule 15 of the Federal Rules of Appellate Procedure, and D.C. Circuit Rule 15, Sierra Club hereby petition for review of United States Environmental Protection Agency's final action titled "National Emission Standards for Hazardous Air Pollutants: National Perchloroethylene Air Emission Standards for Dry Cleaning Facilities Technology Review" and published in the Federal Register at 90 Fed. Reg. 1,041 (Jan. 7, 2025) (attached).

DATED: March 7, 2025    Respectfully submitted,

                */s/ James Pew*
                James Pew
                Lillian Zhou
                Earthjustice

1

1001 G. St., NW, Ste. 1000
Washington, D.C. 20001
(202) 667-4500
jpew@earthjustice.org
lzhou@earthjustice.org

*Counsel for Sierra Club*

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| SIERRA CLUB,<br><br>*Petitioner*,<br><br>v.<br><br>U.S. ENVIRONMENTAL PROTECTION AGENCY and LEE M. ZELDIN, in his official capacity as Administrator of the United States Environmental Protection Agency,<br><br>*Respondents*. | Case No. |

## RULE 26.1 DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, Petitioner Sierra Club makes the following disclosure:

Sierra Club is a non-profit corporation organized under the laws of the State of California. Sierra Club's mission is to explore, enjoy, and protect the wild places of the Earth; to practice and promote the responsible use of the Earth's resources and ecosystems; to educate and enlist humanity to protect and restore the quality of the natural and human environment; and to use all lawful means to carry out these objectives.

Sierra Club does not have any parent corporations, and no publicly held corporation has a ten percent or greater ownership interest in Sierra Club.

DATED: March 7, 2025                    Respectfully submitted,

                                                            */s/ James Pew*
                                                            James Pew
                                                            Lillian Zhou
                                                            Earthjustice
                                                            1001 G. St., NW, Ste. 1000
                                                            Washington, D.C. 20001
                                                            (202) 667-4500
                                                            jpew@earthjustice.org
                                                            lzhou@earthjustice.org

                                                            *Counsel for Sierra Club*

# CERTIFICATE OF SERVICE

I hereby certify that on this 7th day of March, 2025, the foregoing **Petition for Review** and **Rule 26.1 Disclosure Statement** were served on Respondents by sending a copy via First Class Mail to each of the following addresses:

>Lee M. Zeldin, Administrator
>Office of the Administrator (1101A)
>United States Environmental Protection Agency
>1200 Pennsylvania Avenue, N.W.
>Washington, D.C. 20460
>
>Pamela Bondi
>Attorney General of the United States
>United States Department of Justice
>950 Pennsylvania Avenue, N.W.
>Washington, D.C. 20530-0001
>
>Correspondence Control Unit
>Office of General Counsel (2310A)
>United States Environmental Protection Agency
>1200 Pennsylvania Avenue, N.W.
>Washington, D.C. 20460

>*/s/ James Pew*
>James Pew

# ATTACHMENT



typographical error to correct a reference in 40 CFR 63.1(c)(6)(iii) to 40 CFR part 63 subpart MMM instead of 40 CFR part 63 subpart HHH. It is critical to timely correct the identified error to avoid confusion.

This action is effective immediately upon publication. The APA typically requires publication of a final rule to precede its effective date by at least 30 days unless, as relevant here, the agency finds good cause to make the rule effective sooner. APA section 553(b)(B). Under APA section 553(d), these technical corrections are both necessary and beneficial to regulated entities in understanding and complying with the final rule's requirements. Further, because this rule does not impose any new regulatory requirements, the regulated community does not need time to prepare for it to come into effect. *See Omnipoint Corp.* v. *Fed. Commc'n Comm'n,* 78 F.3d 620, 630 (D.C. Cir. 1996) (in determining whether good cause exists to make a rule immediately effective, an agency should ''balance the necessity for immediate implementation against principles of fundamental fairness which require that all affected persons be afforded a reasonable amount of time to prepare for the effective date of its ruling'').

Good cause exists for this rule to be made immediately effective. The EPA has balanced the necessity for immediate implementation against the benefits of delaying implementation. Because this rule makes a typographical correction to a rule that has already been promulgated, the public is aware of the content of the rule. Making the corrections effective immediately will make the regulatory text consistent with what the proposed rule and the preamble to the final rule have described.

## List of Subjects in 40 CFR Part 63

Environmental protection, Administrative practices and procedures, Air pollution control, Hazardous substances, Intergovernmental relations, Reporting and recordkeeping requirements.

**Michael S. Regan,**

*Administrator.*

For the reasons set forth in the preamble, the Environmental Protection Agency is amending title 40, chapter I, part 63 of the Code of Federal Regulations as follows:

## PART 63—NATIONAL EMISSION STANDARDS FOR HAZARDOUS AIR POLLUTANTS FOR SOURCE CATEGORIES

■ 1. The authority citation for part 63 continues to read as follows:

**Authority:** 42 U.S.C. 7401, *et seq.*

### Subpart A—General Provisions

■ 2. Amend § 63.1 by revising paragraph (c)(6)(iii) as follows:

### § 63.1 Applicability.

\* \* \* \* \*

(c) \* \* \*

(6) \* \* \*

(iii) After September 10, 2024, affected sources subject to the following 40 CFR part 63 subparts on September 10, 2024, must remain subject to those subparts, and any modifications thereafter, even if the source becomes an area source by reducing both its actual emissions and potential to emit hazardous air pollutants to below major source thresholds: F, G, H, I, L, R, X, CC, GG, II, JJ, KK, LL, MM, EEE, JJJ, LLL, MMM, RRR, UUU, FFFF, JJJJ, MMMM, PPPP, ZZZZ, CCCCC, DDDDD, FFFFF, IIIII, LLLLL, YYYYY, JJJJJJ, EEEEEEE.

\* \* \* \* \*

[FR Doc. 2024–31226 Filed 1–6–25; 8:45 am]

**BILLING CODE P**

## ENVIRONMENTAL PROTECTION AGENCY

### 40 CFR Part 63

[EPA–HQ–OAR–2005–0155; FRL–8391–01–OAR]

RIN 2060–AV44

### National Emission Standards for Hazardous Air Pollutants: National Perchloroethylene Air Emission Standards for Dry Cleaning Facilities Technology Review

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Final determination.

**SUMMARY:** This action finalizes the Clean Air Act (CAA) technology review (TR) conducted for the commercial and industrial dry cleaning facilities using perchloroethylene (PCE) as the cleaning solvent (PCE Dry Cleaning) source categories regulated under National Emission Standards for Hazardous air Pollutants (NESHAP). This final rule does not finalize the changes made at proposal and makes no amendments to the current NESHAP given the recently finalized action under the Toxic Substance Control Act (TSCA) which has instituted a 10-year phaseout of the use of PCE for dry cleaning.

**DATES:** This action is effective on January 7, 2024.

**ADDRESSES:** The U.S. Environmental Protection Agency (EPA) has established a docket for this action under Docket ID No. EPA–HQ–OAR–2005–0155. All documents in the docket are listed on the *https://www.regulations.gov/* website. Although listed, some information is not publicly available, *e.g.,* Confidential Business Information or other information whose disclosure is restricted by statute. Certain other material, such as copyrighted material, is not placed on the internet and will be publicly available only in hard copy form. Publicly available docket materials are available either electronically through *https://www.regulations.gov/,* or in hard copy at the EPA Docket Center, WJC West Building, Room Number 3334, 1301 Constitution Ave. NW, Washington, DC. The Public Reading Room hours of operation are 8:30 a.m. to 4:30 p.m. Eastern Standard Time (EST), Monday through Friday. The telephone number for the Public Reading Room is (202) 566–1744, and the telephone number for the EPA Docket Center is (202) 566–1742.

**FOR FURTHER INFORMATION CONTACT:** For questions about this final action, contact U.S. EPA, Attn: Reginald Goodwin, Mail Drop: D243–04, 109 T.W. Alexander Drive, P.O. Box 12055, RTP, North Carolina 27711; telephone number: (919) 541–5313; and email address: *goodwin.reginald@epa.gov.*

**SUPPLEMENTARY INFORMATION:**

*Preamble acronyms and abbreviations.* Throughout this notice the use of ''we,'' ''us,'' or ''our'' is intended to refer to the EPA. We use multiple acronyms and terms in this preamble. While this list may not be exhaustive, to ease the reading of this preamble and for reference purposes, the EPA defines the following terms and acronyms here:

CAA  Clean Air Act
CFR  Code of Federal Regulations
EPA  U.S. Environmental Protection Agency
FR  Federal Register
GACT  generally available control technology
HAP  hazardous air pollutants(s)
LDAR  leak detection and repair
MACT  maximum achievable control technology
NAICS  North American Industry Classification System
NESHAP  National Emission Standards for Hazardous Air Pollutants
NTTAA  National Technology Transfer and Advancement Act

OCSPP   Office of Chemical Safety and Pollution Prevention
OMB   Office of Management and Budget
PCE   perchloroethylene
PRA   Paperwork Reduction Act
RFA   Regulatory Flexibility Act
tpy   tons per year
TR   technology review
TSCA   Toxic Substance Control Act
UMRA   Unfunded Mandates Reform Act

*Background information.* On December 27, 2021, the EPA proposed revisions to the National Perchloroethylene Air Emission Standards for Dry Cleaning Facilities NESHAP (hereafter referred to as the PCE Dry Cleaning NESHAP) based on our technology review (TR). In this action, we are finalizing decisions for the rule. We summarize some of the more significant comments we timely received regarding the proposed rule and provide our responses in this preamble. A summary of all other public comments on the proposal and the EPA's responses to those comments is available in the *Response to Comments National Perchloroethylene Air Emissions Standards for Dry Cleaning Facilities* document, which is available in the Docket for this rulemaking (Docket ID No. EPA–HQ–OAR–2005–0155).

*Organization of this document.* The information in this preamble is organized as follows:

I. General Information
  A. Does this action apply to me?
  B. Where can I get a copy of this document and other related information?
  C. Judicial Review and Administrative Reconsideration
II. Background
  A. What is the statutory authority for this action?
  B. What are the PCE Dry Cleaning source categories and how does the NESHAP regulate HAP emissions from these source categories?
  C. What changes did we propose for the PCE Dry Cleaning NESHAP in our December 27, 2021, proposal?
III. What is included in this final rule?
  A. What are the final rule amendments based on the technology review for the PCE Dry Cleaning NESHAP?
IV. What is the rationale for our final decisions and amendments for the PCE Dry Cleaning NESHAP?
  A. Technology Review for the PCE Dry Cleaning NESHAP
V. Summary of Cost, Environmental, and Economic Impacts and Additional Analyses Conducted
  A. What are the affected facilities?
  B. What are the air quality, cost, economic impacts, and benefits?
  C. What analysis of environmental justice did we conduct?
  D. What analysis of children's environmental health did we conduct?
VI. Statutory and Executive Order Reviews
  A. Executive Orders 12866: Regulatory Planning and Review, Executive Order 13563: Improving Regulation and Regulatory Review, and Executive Order 14094: Modernizing Regulatory Review
  B. Paperwork Reduction Act (PRA)
  C. Regulatory Flexibility Act (RFA)
  D. Unfunded Mandates Reform Act (UMRA)
  E. Executive Order 13132: Federalism
  F. Executive Order 13175: Consultation and Coordination With Indian Tribal Governments
  G. Executive Order 13045: Protection of Children From Environmental Health Risks and Safety Risks
  H. Executive Order 13211: Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution, or Use
  I. National Technology Transfer and Advancement Act (NTTAA)
  J. Executive Order 12898: Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations
  K. Congressional Review Act (CRA)

## I. General Information

*A. Does this action apply to me?*

*Regulated entities.* Categories and entities potentially regulated by this action are shown in table 1 of this preamble.

TABLE 1—NESHAP AND INDUSTRIAL SOURCE CATEGORIES AFFECTED BY THIS FINAL RULE

| Source Category and NESHAP | NAICS code [1] |
|---|---|
| Dry Cleaning | 812310, 812320, 812332 |

[1] North American Industry Classification System (NAICS).

This list of categories and NAICS codes is not intended to be exhaustive, but rather provides a guide for readers regarding the entities likely to be affected by the final action for the source categories listed. To determine whether your facility is affected, you should examine the applicability criteria in the appropriate NESHAP. If you have any questions regarding the applicability of any aspect of this NESHAP, please contact the person listed in the preceding **FOR FURTHER INFORMATION CONTACT** section of this preamble.

*B. Where can I get a copy of this document and other related information?*

In addition to being available in the docket, an electronic copy of this final action will also be available on the internet. Following signature by the EPA Administrator, the EPA will post a copy of this final action at: *https://www.epa.gov/stationary-sources-air-pollution/dry-cleaning-facilities-national-perchloroethylene-air-emission.* Following publication in the **Federal Register,** the EPA will post the **Federal Register** version and key technical documents at this same website.

Additional information is available on the RTR website at *https://www.epa.gov/stationary-sources-air-pollution/risk-and-technology-review-national-emissions-standards-hazardous.* This information includes an overview of the RTR program and links to project websites for the RTR source categories.

*C. Judicial Review and Administrative Reconsideration*

Under Clean Air Act (CAA) section 307(b)(1), judicial review of this final action is available only by filing a petition for review in the United States Court of Appeals for the District of Columbia Circuit (the court) by March 10, 2024. Under CAA section 307(b)(2), the requirements established by this final rule may not be challenged separately in any civil or criminal proceedings brought by the EPA to enforce the requirements.

Section 307(d)(7)(B) of the CAA further provides that only an objection to a rule or procedure which was raised with reasonable specificity during the period for public comment (including any public hearing) may be raised during judicial review. This section also provides a mechanism for the EPA to reconsider the rule if the person raising an objection can demonstrate to the Administrator that it was impracticable to raise such objection within the period for public comment or if the grounds for such objection arose after the period for public comment (but within the time specified for judicial review) and if such objection is of central relevance to the outcome of the rule. Any person seeking to make such a demonstration should submit a Petition for Reconsideration to the Office of the Administrator, U.S. EPA, Room 3000, WJC South Building, 1200 Pennsylvania Ave. NW, Washington, DC 20460, with a copy to both the person(s) listed in the preceding **FOR FURTHER INFORMATION CONTACT** section, and the Associate General Counsel for the Air and Radiation Law Office, Office of General Counsel (Mail Code 2344A), U.S. EPA, 1200 Pennsylvania Ave. NW, Washington, DC 20460.

## II. Background

*A. What is the statutory authority for this action?*

The statutory authority for this action is provided by section 112 of the Clean Air Act (CAA), as amended (42 U.S.C. 7401 *et seq.*). Section 112 of the CAA establishes a two-stage regulatory process to develop standards for emissions of hazardous air pollutants (HAP) from stationary sources. Generally, the first stage involves establishing technology-based standards and the second stage involves evaluating those standards that are based on maximum achievable control technology (MACT) to determine whether additional standards are needed to address any remaining risk associated with HAP emissions. This second stage is commonly referred to as the ''residual risk review.'' In addition to the residual risk review, the CAA also requires the EPA to review standards set under CAA section 112 every 8 years and revise the standards as necessary taking into account developments in practices, processes, or control technologies. This review is commonly referred to as the ''technology review,'' and is the subject of this final rule. The discussion that follows identifies the most relevant statutory sections and briefly explains the contours of the methodology used to implement these statutory requirements.

In the first stage of the CAA section 112 standard setting process, the EPA promulgates technology-based standards under CAA section 112(d) for categories of sources identified as emitting one or more of the HAP listed in CAA section 112(b). Sources of HAP emissions are either major sources or area sources, and CAA section 112 establishes different requirements for major source standards and area source standards. ''Major sources'' are those that emit or have the potential to emit 10 tons per year (tpy) or more of a single HAP or 25 tpy or more of any combination of HAP. All other sources are ''area sources.'' For major sources, CAA section 112(d)(2) provides that the technology-based NESHAP must reflect the maximum degree of emission reductions of HAP achievable (after considering cost, energy requirements, and non-air quality health and environmental impacts). These standards are commonly referred to as MACT standards. CAA section 112(d)(3) also establishes a minimum control level for MACT standards, known as the MACT ''floor.'' In certain instances, as provided in CAA section 112(h), the EPA may set work practice standards in lieu of numerical emission standards.

The EPA must also consider control options that are more stringent than the floor. Standards more stringent than the floor are commonly referred to as ''beyond-the-floor'' standards. For area sources, CAA section 112(d)(5) allows the EPA to set standards based on generally available control technologies or management practices (GACT standards) standards in lieu of MACT standards. For categories of major sources and any area source categories subject to MACT standards, the second stage in standard-setting focuses on identifying and addressing any remaining (*i.e.,* ''residual'') risk pursuant to CAA section 112(f) and concurrently conducting a TR pursuant to CAA section 112(d)(6). For categories of area sources subject to GACT standards, there is no requirement to address residual risk, but, similar to the major source categories, the TR is required.

CAA section 112(d)(6) requires the EPA to review standards promulgated under CAA section 112 and revise them ''as necessary (taking into account developments in practices, processes, and control technologies)'' no less often than every 8 years. In conducting this review, which we call the ''technology review,'' the EPA is not required to recalculate the MACT floors that were established in earlier rulemakings. *Natural Resources Defense Council (NRDC)* v. *EPA,* 529 F.3d 1077, 1084 (D.C. Cir. 2008). *Association of Battery Recyclers, Inc.* v. *EPA,* 716 F.3d 667 (D.C. Cir. 2013). The EPA may consider cost in deciding whether to revise the standards pursuant to CAA section 112(d)(6). The EPA is required to address regulatory gaps, such as missing standards for listed air toxics known to be emitted from the source category, and any new MACT standards must be established under CAA sections 112(d)(2) and (3), or, in specific circumstances, CAA sections 112(d)(4) or (h). *Louisiana Environmental Action Network (LEAN)* v. *EPA,* 955 F.3d 1088 (D.C. Cir. 2020).

*B. What are the PCE Dry Cleaning source categories and how does the NESHAP regulate HAP emissions from these source categories?*

The EPA promulgated the PCE Dry Cleaning NESHAP on September 22, 1993 (58 FR 49376), as 40 CFR part 63, subpart M. Significant amendments were promulgated on June 3, 1996 (61 FR 27788), December 14, 1999 (64 FR 69643), July 27, 2006 (71 FR 42743), and July 11, 2008 (73 FR 39871). The PCE Dry Cleaning NESHAP includes MACT standards which apply to major sources, and GACT standards which apply to area sources of dry cleaning that use the chemical PCE. The PCE Dry Cleaning NESHAP regulates PCE emitted from the dry cleaning process. The source categories covered by these MACT and GACT standards currently include all PCE dry cleaning facilities in the U.S.

Dry cleaning is any cleaning process for clothing using a solvent other than water. Perchloroethylene (PCE), also known as perc, tetrachloroethene and tetrachloroethylene, is widely used in the industry. Establishments may also offer specialty cleaning services for garments and textiles. The 1993 NESHAP exempted coin-operated dry cleaning machines.

There are two types of PCE dry cleaning machines: transfer and dry-to-dry. Similar to residential washing machines and dryers, transfer machines include a unit for washing and another unit for drying. Following the wash cycle, PCE-containing articles are manually transferred from the washer to the dryer. The transfer of wet fabrics is the predominant source of PCE emissions in these systems.

1. Transfer Machines (First Generation)

Transfer machines are prohibited at all existing and new major and area sources due to the NESHAP's requirement that dry cleaning systems eliminate any emissions of PCE while transferring articles between the washer and the dryer or reclaimer. Therefore, transfer machines are no longer sold, and none are known to still be in operation as these machines have reached the end of their useful lives and should have been replaced by dry-to-dry machines.

2. Dry-to-Dry Machines (Second, Third, Fourth and Fifth Generation)

Dry-to-dry machines wash, extract, and dry the articles in a single machine. Eliminating the transfer step results in much lower emissions.

a. ''Second generation'' dry-to-dry machines were vented to the atmosphere from the machine-washing drum at the time that the machine is opened following the drying cycle.

b. ''Third generation'' dry-to-dry machines operated the first ''closed-loop'' machines. This is the first generation where emissions were routed to a refrigerated condenser.

c. ''Fourth generation'' dry-to-dry machines (technology from the early 1990s) are closed-loop systems using the secondary controls refrigerated condenser(s) and a carbon adsorption unit(s). The condenser is a vapor recovery system, condensing PCE by cooling the gas-vapor stream. The air remaining at the end of the cycle passes

through a carbon adsorber—a bed of activated carbon into which the air-PCE gas-vapor stream is routed—that removes PCE from the gas-vapor stream prior to door opening. The implementation of both the condenser and adsorber offers greater emissions reductions over a dry-to-dry machine with only a refrigerated condenser, reducing PCE concentration in the air remaining in the machine once the cleaning cycle is complete instead of allowing ventilation or release at the end of the dry cleaning cycle.

d. "Fifth generation" machines (technology from the late 1990s) have the same control technology as fourth generation machines, but are also equipped with an inductive fan, internal solvent vapor monitoring devices (sensor) and interlock (lockout) devices not allowing access to the machine until solvent vapor concentrations are below 300 ppm.

Per 40 CFR 63.320, a dry cleaning facility is a major source if the facility emits or has the potential to emit more than 10 tons per year of PCE to the atmosphere. A dry cleaning facility is considered an area source if it does not meet the criteria for major sources, as specified in 40 CFR 63.320. However, in lieu of measuring or determining a facility's potential to emit PCE emissions, a dry cleaning facility is a major source if: (1) it includes only dry-to-dry machine(s) and has a total yearly PCE consumption greater than 2,100 gallons as determined according to 40 CFR 63.323(d); or (2) it includes only transfer machine system(s) or both dry-to-dry machine(s) and transfer machine system(s) and has a total yearly PCE consumption greater than 1,800 gallons as determined according to 40 CFR 63.323(d). As defined by the initial list of source categories published on July 16, 1992 (57 FR 31576), the PCE Dry Cleaning NESHAP applies to the following major and area sources of HAP emissions:

Major Source Categories

- Commercial Dry Cleaning [Perchloroethylene]—Transfer Machines
- Industrial Dry Cleaning [Perchloroethylene]—Transfer Machines
- Industrial Dry Cleaning [Perchloroethylene]—Dry-to-Dry Machines

Area Source Categories

- Commercial Dry Cleaning [Perchloroethylene]—Transfer Machines
- Commercial Dry Cleaning [Perchloroethylene]—Dry-to-Dry Machines

In general, the PCE Dry Cleaning NESHAP affects three types of dry cleaners that use PCE: commercial, industrial, and co-residential. Commercial facilities clean household items such as suits, dresses, coats, pants, comforters, curtains, leather clothing, and formal wear. Industrial dry cleaners clean heavily stained articles such as work gloves, uniforms, mechanics' overalls, mops, and shop rags. Co-residential facilities were a subset of commercial operations and included dry cleaning operations located in buildings in which people reside. Co-residential facilities were generally found in urban areas where commercial and residential occupancy occur in a single building, but these facilities are no longer allowed to operate based on the NESHAP requirements.

The PCE Dry Cleaning NESHAP identifies all major sources as "large" industrial and commercial dry cleaners. These dry cleaners are subject to MACT standards under this NESHAP. It is estimated that there are five or fewer of these major source dry cleaners remaining in the United States.[1] The PCE Dry Cleaning NESHAP requires *new* major source PCE dry cleaners operating dry-to-dry machines to:

- Operate with a refrigerated condenser and carbon adsorber process controls.
- Use an enhanced leak detection and repair (LDAR) program to detect PCE leaks from the machines (*i.e.,* PCE gas analyzer operated according to EPA Method 21), repair the leaks, and maintain records.

The PCE Dry Cleaning NESHAP requires *existing* major source PCE dry cleaners operating dry-to-dry machines to:

- Operate with a refrigerated condenser or a carbon adsorber as process control.
- Use an enhanced leak detection and repair (LDAR) program to detect PCE leaks from the machines (*i.e.,* PCE gas analyzer operated according to EPA Method 21), repair the leaks, and maintain records.

Dry cleaners that are commonly found in community settings (*e.g.,* shopping centers and strip malls) are typically "area sources," meaning they emit less than 10 tons of PCE each year and are smaller in size in comparison to major source industrial and commercial PCE dry cleaners. The PCE Dry Cleaning NESHAP standards for these area sources are GACT standards. The PCE Dry Cleaning NESHAP requires *existing* area source PCE dry cleaners operating dry-to-dry machines to:

- Use a halogenated hydrocarbon detector or PCE gas analyzer monthly to detect PCE leaks, repair the leaks, and maintain records.

*New* area source PCE dry cleaners operating dry-to-dry machines must:

- Operate non-vented dry-to-dry machines with a refrigerated condenser and secondary carbon adsorber.
- Use a halogenated hydrocarbon detector or PCE gas analyzer to detect PCE leaks, repair the leaks, and maintain records.

Petitions for judicial review of the 2006 amendments to the NESHAP were filed by the Sierra Club, Halogenated Solvents Industry, Neighborhood Cleaners Association, International Fabricare Institute, and Textile Care Allied Trades Association. *Sierra Club et al.* v. *USEPA,* No. 06–1330 (and consolidated cases) (D.C. Cir.). Petitioners questioned whether the EPA reasonably interpreted CAA section 112(d)(6) to allow consideration of risk and costs as factors in determining the extent to which it was necessary to revise standards regulating PCE; whether the EPA reasonably determined under section 112(d)(6) that it was necessary to revise standards regulating PCE, and to require elimination of PCE emissions at co-residential systems but not at other systems; whether the EPA had complied with the Regulatory Flexibility Act (RFA); and whether the EPA had reasonably denied a petition for reconsideration of the rule submitted by the Sierra Club. Although the case was fully briefed, in 2009 before it could be argued at the D.C. Circuit, the parties agreed to EPA taking a voluntary remand of the rule for the administration to consider whether further administrative action was warranted regarding the challenged issues, while leaving the rule in force. As discussed in section III.A of this preamble, we are finalizing our response to the voluntary remand as part of this final rule making.

*C. What changes did we propose for the PCE Dry Cleaning NESHAP in our December 27, 2021, proposal?*

On December 27, 2021, the EPA published a proposed rule in the **Federal Register** for the PCE Dry Cleaning NESHAP that took into consideration the TR analyses. We

---

[1] Estimated quantity of major source PCE dry cleaners is based on details provided to EPA by state regulators, State small business environmental assistance providers' programs (SBEAP) personnel, and industry trade association representatives. Refer to the docket for this rule (Docket ID No. EPA–HQ–OAR–2005–0155).

proposed to require that all PCE dry to dry machines at existing major and areas sources have both refrigerated condensers and carbon adsorbers as secondary controls. At the time this action was proposed, the available data indicated that no third-generation machines were still in use and since fourth and fifth generation machines already use both refrigerated condensers and carbon adsorbers, the proposed amendment would have no costs or economic impacts. We also proposed a response to the 2009 voluntary remand, stating that the 2006 RTR was appropriate and proposed no changes from how we addressed the PCE ban and phaseout for co-residential sources.

### III. What is included in this final rule?

This action finalizes the EPA's determinations pursuant to the TR provisions of CAA section 112 for the PCE Dry Cleaning NESHAP.

*A. What are the final rule amendments based on the technology review for the PCE Dry Cleaning NESHAP?*

We are finalizing a determination that there are no necessary revisions to the NESHAP after considering developments in practices, processes, and control technologies. We note that, as discussed in section IV of this document, a separate regulatory action under TSCA has finalized a 10-year phaseout of the use of PCE in dry cleaning. Therefore, we are not finalizing revisions to the currently promulgated NESHAP standards under CAA section 112(d)(6). Further, in response to the voluntary remand of the 2006 RTR, we are likewise concluding that no further evaluation of the NESHAP's approach to addressing the PCE ban and phaseout for co-residential sources in the 2006 RTR is warranted, considering the EPA's recent more comprehensive prohibition of the use of PCE in dry cleaning and spot cleaning under TSCA.

### IV. What is the rationale for our final decisions and amendments for the PCE Dry Cleaning source categories?

The EPA addressed the results of the TR for the PCE Dry Cleaning NESHAP in accordance with section 112(d)(6) of the Clean Air Act (CAA). This section provides a description of what we proposed and what we are finalizing, a summary of key comments and responses, and the EPA's rationale for the final decisions. For all comments not discussed in this preamble, comment summaries and the EPA's responses can be found in *Response to Comments National Perchloroethylene Air Emissions Standards for Dry Cleaning Facilities* available in the docket.

*A. Technology Review for the PCE Dry Cleaning NESHAP*

1. What did we propose pursuant to CAA section 112(d)(6) for the PCE Dry Cleaning NESHAP?

The proposed rule published on December 27, 2021 (86 FR 73207), proposed to require all sources subject to the PCE Dry Cleaning NESHAP, whether new or existing, to be equipped with refrigerated condensers and carbon adsorbers. The TR proposed that existing affected sources would comply with the proposed amendments in this rulemaking no later than 180 days after the effective date of the final rule. We estimated in the proposal that no third-generation machines were still in use, therefore, the proposed amendment would have no costs or other impacts.

We also proposed a response to the 2009 voluntary remand, stating that our approach in the 2006 RTR to base our decisions to revise the standards as necessary for dry cleaners located in residential settings, based in part on the unique public health impacts that the additionally mandated HAP reductions would mitigate in that context, was warranted under CAA section 112(d)(6).

2. How did the technology review change for the PCE Dry Cleaning NESHAP?

Upon further review and based on public comments, the EPA has determined that our understanding, outlined in our proposal, that all third-generation machines have been retired is not correct. However, since the PCE Dry Cleaning NESHAP proposal, in 2021 the EPA's Office of Chemical Safety and Pollution Prevention (OCSPP) published an updated risk analysis on PCE under section 6(b) of the Toxic Substances Control Act (TSCA), finding unreasonable risk with PCE due to unreasonable carcinogenic risk, which triggered a duty for the EPA to promulgate a rule under section 6(a) of TSCA to address such unreasonable risk. In December 2024, OCSPP finalized a comprehensive rule addressing PCE that, among other things, prohibits the use of PCE in dry cleaning with a 10-year phaseout plan (hereafter referred to as the TSCA rule. See, Perchloroethylene (PCE); Regulation under the Toxics Substances Control Act (TSCA); Final Rule [to be codified at 40 CFR part 751, subpart G. As the EPA explained in the final TSCA rule, the TSCA rule phaseout of PCE use in dry cleaning starts with a prohibition on the industrial or commercial use of PCE in any dry cleaning machine acquired 180 days or later after publication of the final TSCA rule, followed by a prohibition on the industrial or commercial use of PCE in third generation machines three years after publication of the final rule. The final TSCA rule was published in the **Federal Register** on December 18, 2024 (89 FR 103560). Full implementation of the phaseout will be achieved 10 years after publication of the final TSCA rule with a prohibition on the use of PCE in all dry cleaning and spot cleaning, including in fourth and fifth generation machines, and a prohibition on the manufacturing, processing, and distribution in commerce of PCE for use in dry cleaning solvent.

As a result of the TSCA rule prohibiting use of PCE in dry cleaning with a 10-year phaseout plan, which the EPA explained was consistent with requirements in TSCA section 6(d)(1)(C) and (D) to specify mandatory compliance dates for the start of the phaseout requirements that are as soon as practicable but not later than five years after the final TSCA rule's promulgation and to specify mandatory compliance dates for full implementation of phaseout requirements that are as soon as practicable, as well as providing a reasonable transition period consistent with TSCA section 6(d)(1)(E), the EPA is finalizing no changes to the CAA NESHAP. Regarding the proposed retrofit of older third generation systems specifically, as the TSCA rule prohibits the use of such machines after three years from its promulgation and prohibits acquiring any new dry cleaning machines that use PCE 180 days after publication of the final TSCA rule, it is unnecessary to additionally require retrofitting of third generation machines separately under the PCE Dry Cleaning NESHAP. Requiring such retrofitting of third generation machines under the NESHAP could result in their becoming reconstructed new sources, and result in forcing owners and operators into risking violation of the TSCA rule's prohibition of acquiring new dry cleaning machines that use PCE.

3. What key comments did we receive on the technology review, and what are our responses?

*Comment:* One commenter believes that if the EPA had properly evaluated risk in the 2006 RTR, then the Agency would have phased out PCE completely in that rule, or at least in co-commercial facilities. They disagree with the EPA's position that the Agency is not obligated to perform risk assessments under CAA

section 112(f) on area sources. They highlighted "uncontroverted record evidence showing that the risk from these facilities is 1,000-in-one million" and that the proposed controls from the 2006 rule only reduced risk to 175-in-one million, which is above the 100-in-one million presumed acceptable benchmark used by the EPA is residual risk reviews.

The commenter claims "no reasonable basis" to not phase out PCE completely. They assert that alternative solvents can replace PCE without additional costs, that other States and municipalities have banned PCE, and that the EPA banned it for co-residential facilities. They believe that extant bans are a development in practices that should be considered under CAA section 112(d)(6). The commenter says the EPA did not explain why costs were unreasonable, nor why limitations of alternative solvents were significant enough to warrant needing PCE. They maintain that the Agency cannot argue that it does not have enough information to support a broader PCE ban since it did not attempt to solicit or collect such information, and the Agency has failed to "grapple with record evidence undercutting its risk rationale for refusing to require a PCE phaseout at area source dry cleaners."

A commenter claimed that in the Agency's response to comments for the 2006 rule, the EPA states that area sources do not warrant a ban on PCE. The commenter states that the Agency cannot use such a statutory interpretation because the EPA did not mention it in the proposed rule.

In addition, a commenter asked that the EPA consider the then-pending PCE TSCA risk evaluation recommendations and any potential new environmental regulations that may impact small business dry cleaning owner/operators.

*Response:* As noted in Section IV.A.2 of this document, the EPA's OCSPP has separately promulgated a final rule under section 6 of TSCA that prohibits the use of PCE in dry cleaning machines with a 10-year phaseout period for full compliance. The TSCA rule phaseout starts with a prohibition on use of PCE in any dry cleaning machine acquired 180 days or later after the publication of the final TSCA rule, followed by a prohibition on the use of PCE in third generation machines three years after publication. Consequently, the comments objecting to the 2006 rule's and the 2021 proposal's not more broadly prohibiting the use of PCE use at dry cleaners are now moot, and it is not necessary to further respond to them.

The EPA agrees that appropriate offices within the Agency should collaborate when addressing emission sources controlled under multiple regulations. Although the NESHAP and TSCA rules must meet different obligations and consider different factors, the EPA's OCSPP coordinated with the Office of Air & Radiation (OAR) in conducting the TSCA rulemaking. Likewise, the EPA's OAR has coordinated with OCSPP in this NESHAP action, to ensure the rules are consistent and are not unnecessarily duplicative, redundant, or in conflict.

*Comment:* Commenters expressed opposition to the EPA's proposed compliance deadline of no later than 180 days after the effective date of the final rule for existing affected sources.

Commenters assert that there are many facilities which still operate third generation machines past their typical lifespan. The industry is already suffering from lower demand due to COVID–19 making it harder to afford machine upgrades and/or replacement. Further, supply chain issues combined with lack of in-stock supplies and no domestic manufacturers make it unreasonably difficult to purchase appropriate machines or add-on controls in under six months.

One commenter recommended a compliance deadline of at least three years. They justify their position by pointing out that NESHAPs usually allow for up to three years to comply, and that the EPA's previous amendments to the PCE Dry Cleaning NESHAP allowed a 15-year phaseout of PCE machines from co-residential facilities. The Commenter recommended a three- to-five year compliance timeframe.

*Response:* The EPA acknowledges that our expectation in 2021 that there were no third generation machines in operation was incorrect. However, as noted in Section IV.A.2 of this document, the EPA's OCSPP has promulgated a rule under the TSCA that prohibits the use of PCE in dry cleaning machines with a 10-year phaseout period, beginning with a prohibition on the use of PCE in any machine acquired 180 days or later after the TSCA rule's publication and followed by a prohibition on the use of PCE in third generation machines three years after its publication. As a result, we are not additionally finalizing our proposed amendments to the NESHAP to require add-on controls for third generation machines, as the control requirements are no longer necessary.

4. What is the rationale for our final approach for the technology review?

In 2022, the EPA's OCSPP published a final revised risk determination on PCE under the TSCA, finding that PCE presents an unreasonable risk to human health under its conditions of use, including in dry cleaning. Under TSCA section 6(a), if the Agency determines through a TSCA section 6(b) risk evaluation that a chemical substance presents an unreasonable risk of injury to health or the environment, EPA must by rule apply one or more requirements listed in TSCA section 6(a) to the extent necessary so that the chemical substance or mixture no longer presents such risk. The unreasonable risk is largely driven by factors not traditionally considered in conducting risk reviews for NESHAP, such as onsite worker exposure and dermal exposures to non-air forms of the chemical. The technical and scientific record for the TSCA risk assessment was broader and more comprehensive than the EPA's proposed 2021 NESHAP amendments.

In June 2023, the EPA's OCSPP proposed a rule under TSCA (87 FR 39085, June 30, 2022) to ban the use of PCE in dry cleaning, subject to a phaseout of 6 months to 10 years for the various types of equipment (88 FR 39652, June 16, 2023). This rule was promulgated as a final rule and contains a ban on the use of PCE that takes effect in 180 days for newly acquired machines and up to 10 years for existing machines. The TSCA rule prohibits the use of PCE in industrial or commercial third generation machines three years after publication of the final rule.

As a result of the EPA's TSCA rule requiring a prohibition on the use of PCE in dry cleaning machines, the EPA has determined it is not necessary to finalize additional changes to the PCE Dry Cleaning NESHAP under the CAA section 112(d)(6) technology review for the PCE dry cleaning source categories.

## V. Summary of Cost, Environmental, and Economic Impacts and Additional Analyses Conducted

### A. What are the affected facilities?

The PCE Dry Cleaning NESHAP prescribes a combination of equipment, work practices, and operational requirements. The NESHAP defines major and area sources based on the annual PCE purchases for all machines at a facility. The consumption criterion (which affects the amount of PCE purchased) varies depending on multiple variables, including number of machines, size of business, etc. The affected source is each individual dry cleaning system that uses PCE.

Consequently, a single dry cleaning facility could be comprised of multiple affected sources if it has multiple dry cleaning systems onsite. As a result, some of a facility's systems could be subject to "new" source requirements under the NESHAP, and some could be "existing" sources, depending upon when they were placed into service. The TSCA rule estimated that 6,000 dry cleaners still use PCE.

*B. What are the air quality, cost, economic impacts, and benefits?*

As there are no changes to the NESHAP requirements resulting from the final TR, there are no expected air quality, cost, or economic impacts or benefits as a result of this rulemaking.

*C. What analysis of environmental justice did we conduct?*

Because we are not finalizing any changes to the NESHAP as a result of the EPA's TSCA rule prohibiting the use of PCE in dry cleaning machines, we did not conduct a new analysis of environmental justice for this action. For more information, the methodology and the results of the demographic analysis conducted for the proposed rule are presented in a technical report, *Analysis of Demographic Factors for Populations Living Near the Dry-Cleaning Major and Area Sources,* available in the docket for this action (Document ID EPA–HQ–OAR–2005–0155–0597).

*D. What analysis of children's environmental health did we conduct?*

Because we are not finalizing any changes to the NESHAP as a result of the EPA's TSCA rule prohibiting the use of PCE in dry cleaning machines, we did not conduct an analysis of children's environmental health in this action.

**VI. Statutory and Executive Order Reviews**

*A. Executive Orders 12866: Regulatory Planning and Review and Executive Order 14094: Modernizing Regulatory Review*

This action is not a significant regulatory action as defined in Executive Order 12866, as amended by Executive Order 14094, and was therefore not subject to a requirement for Executive Order 12866 review.

*B. Paperwork Reduction Act (PRA)*

This action does not impose any new information collection burden. No new information collection is required as part of this final action; owners and operators will continue to keep records and submit required reports to the EPA, or the delegated State regulatory authority required in the final rule. However, the Office of Management and Budget (OMB) has previously approved the information collection requirements contained in the existing regulations (40 CFR 63 subpart M) under the provisions of the Paperwork Reduction Act 44 U.S.C. 3501 *et seq.* and has assigned OMB control number 2060–0234. The OMB control number for the EPA's regulations in 40 CFR are listed in 40 CFR part 9.

*C. Regulatory Flexibility Act (RFA)*

I certify that this action will not have a significant economic impact on a substantial number of small entities under the RFA. The small entities subject to the requirements of this action are industrial and commercial dry cleaning facilities that use PCE. The North American Industry Classification System (NAICS) codes applicable to 40 CFR part 63, subpart M, are 812310 (coin-operated laundries and dry cleaners), 812320 (dry cleaning and laundry services other than coin-operated services), and 812332 (industrial launderers). The small business size definitions for those industries are $8.0 million, $6.0 million, and $41.5 million respectively. We are not finalizing any new requirements under this action and, therefore, we do not anticipate any small entities to incur costs due to this action. We conclude that this action will not have a significant economic impact on a substantial number of small entities.

*D. Unfunded Mandates Reform Act (UMRA)*

This action does not contain an unfunded mandate of $100 million or more as described in UMRA, 2 U.S.C. 1531–1538, and does not significantly or uniquely affect small governments. The action imposes no enforceable duty on any State, local, or Tribal governments or the private sector.

*E. Executive Order 13132: Federalism*

This action does not have federalism implications. It will not have substantial direct effects on the States, on the relationship between the National Government and the States, or on the distribution of power and responsibilities among the various levels of government.

*F. Executive Order 13175: Consultation and Coordination With Indian Tribal Governments*

As discussed in the proposed rule, this action has Tribal implications. However, it will neither impose substantial direct compliance costs on federally recognized Tribal governments, nor preempt Tribal law. The EPA consulted with Tribal officials under the EPA Policy on Consultation and Coordination with Indian Tribes early in the process of developing this regulation to permit them to have meaningful and timely input into its development.

*G. Executive Order 13045: Protection of Children From Environmental Health Risks and Safety Risks*

Executive Order 13045 directs Federal agencies to include an evaluation of the health and safety effects of the planned regulation on children in Federal health and safety standards and explain why the regulation is preferable to potentially effective and reasonably feasible alternatives. This action is not subject to Executive Order 13045 because it is not a significant regulatory action under section 3(f)(1) of Executive Order 12866, and because the EPA does not believe the environmental health or safety risks addressed by this action present a disproportionate risk to children.

*H. Executive Order 13211: Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution, or Use*

This action is not a "significant energy action" because it is not likely to have a significant adverse effect on the supply, distribution, or use of energy. This action does not impact energy supply, distribution, or use.

*I. National Technology Transfer and Advancement Act (NTTAA)*

This rulemaking does not involve technical standards.

*J. Executive Order 12898: Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations and Executive Order 14096: Revitalizing Our Nation's Commitment to Environmental Justice for All*

The EPA believes that the human health or environmental conditions that exist prior to this action result in or have the potential to result in disproportionate and adverse human health or environmental effects on communities with environmental justice concerns.

The EPA believes that this action is not likely to result in new disproportionate and adverse effects on communities with environmental justice concerns. More information can be found in the technical report, *Analysis of Demographic Factors for Populations Living Near the Dry-Cleaning Major and Area Sources,* available in the docket for

this action (Document ID EPA–HQ–OAR–2005–0155–0597). Additionally, the EPA notes that, separately, the TSCA rule is imposing at 10-year phaseout of the use of PCE in dry cleaning. The EPA explained in the TSCA rule that it believes it will likely reduce existing disproportionate and adverse effect on communities with environmental justice concerns.

*K. Congressional Review Act (CRA)*

This action is subject to the CRA, and the EPA will submit a rule report to each House of the Congress and to the Comptroller General of the United States. This action is not a ''major rule'' as defined by 5 U.S.C. 804(2).

## List of Subjects in 40 CFR Part 63

Environmental protection, Administrative practice and procedures, Air pollution control, Hazardous substances, Intergovernmental relations, Reporting and recordkeeping requirements.

**Michael S. Regan,**
*Administrator.*
[FR Doc. 2024–31223 Filed 1–6–25; 8:45 am]
**BILLING CODE 6560–50–P**

## DEPARTMENT OF COMMERCE

## National Oceanic and Atmospheric Administration

## 50 CFR Part 679

[Docket No. 240304–0068; RTID 0648–XE600]

## Fisheries of the Exclusive Economic Zone Off Alaska; Reallocation of Pacific Cod in the Bering Sea and Aleutian Islands Management Area

**AGENCY:** National Marine Fisheries Service (NMFS), National Oceanic and Atmospheric Administration (NOAA), Commerce.
**ACTION:** Temporary rule; reallocation.

**SUMMARY:** NMFS is reallocating the projected unused amount of Pacific cod total allowable catch (TAC) from vessels using jig gear, to catcher vessels less than 60 feet (18.3 meters (m)) length overall (LOA) using hook-and-line or pot gear in the Bering Sea and Aleutian Islands (BSAI) management area. This action is necessary to allow the A season apportionment of the 2025 total allowable catch of Pacific cod to be harvested.

**DATES:** Effective January 2, 2025, through 2,400 hours, Alaska local time (A.l.t.), December 31, 2025.

**FOR FURTHER INFORMATION CONTACT:** Andrew Olson, 907–586–7228.

**SUPPLEMENTARY INFORMATION:** NMFS manages the groundfish fishery in the BSAI according to the Fishery Management Plan for Groundfish of the Bering Sea and Aleutian Islands Management Area (FMP) prepared by the North Pacific Fishery Management Council under authority of the Magnuson-Stevens Fishery Conservation and Management Act (Magnuson-Stevens Act). Regulations governing fishing by U.S. vessels in accordance with the FMP appear at subpart H of 50 CFR part 600 and 50 CFR part 679.

The A season apportionment of the 2025 Pacific cod TAC specified for vessels using jig gear in the BSAI is 1,067 metric tons (mt) as established by the final 2024 and 2025 harvest specifications for groundfish in the BSAI (89 FR 17287, March 11, 2024) and inseason adjustment (89 FR 105478, December 27, 2024).

The 2025 Pacific cod TAC allocated to catcher vessels less than 60 feet (18.3 m) LOA using hook-and-line or pot gear in the BSAI is 2,525 mt as established by final 2024 and 2025 harvest specifications for groundfish in the BSAI (89 FR 17287, March 11, 2024) and inseason adjustment (89 FR 105478, December 27, 2024).

The Administrator, Alaska Region, NMFS, (Regional Administrator) has determined that jig vessels will not be able to harvest 1,000 mt of the A season apportionment of the 2025 Pacific cod TAC allocated to those vessels under § 679.20(a)(7)(ii)(A)(*1*). Therefore, in accordance with § 679.20(a)(7)(iv)(C), NMFS apportions 1,000 mt of Pacific cod from the A season jig gear apportionment to the annual amount specified for catcher vessels less than 60 feet (18.3 m) LOA using hook-and-line or pot gear.

The harvest specifications for 2025 Pacific cod included in final 2024 and 2025 harvest specifications for groundfish in the BSAI (89 FR 17287, March 11, 2024) and inseason adjustment (89 FR 105478, December 27, 2024) are revised as follows: 67 mt to the A season apportionment and 779 mt to the annual amount for vessels using jig gear, and 3,525 mt to catcher vessels less than 60 feet (18.3 m) LOA using hook-and-line or pot gear.

## Classification

NMFS issues this action pursuant to section 305(d) of the Magnuson-Stevens Act. This action is required by 50 CFR part 679, which was issued pursuant to section 304(b), and is exempt from review under Executive Order 12866.

Pursuant to 5 U.S.C. 553(b)(B), there is good cause to waive prior notice and an opportunity for public comment on this action, as notice and comment would be impracticable and contrary to the public interest, as it would prevent NMFS from responding to the most recent fisheries data in a timely fashion and would delay the reallocation of Pacific cod specified from jig vessels to catcher vessels less than 60 feet (18.3 m) LOA using hook-and-line or pot gear. NMFS was unable to publish a notice providing time for public comment because the most recent, relevant data only became available as of December 31, 2024.

The Assistant Administrator for Fisheries, NOAA also finds good cause to waive the 30-day delay in the effective date of this action under 5 U.S.C. 553(d)(3). This finding is based upon the reasons provided above for waiver of prior notice and opportunity for public comment.

**Authority:** 16 U.S.C. 1801 *et seq.*

Dated: January 2, 2025.

**Karen H. Abrams,**
*Acting Director, Office of Sustainable Fisheries, National Marine Fisheries Service.*
[FR Doc. 2025–00112 Filed 1–2–25; 4:15 pm]
**BILLING CODE 3510–22–P**